**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JOHN F. FRANCIS,** | |
| **Petitioner,** | |
| **v.** | **Case No. 21-3079-DDC** |
| **CHANDLER CHEEKS, et al.,[1]** | |
| **Respondents.** | |

**MEMORANDUM AND ORDER**

Petitioner John F. Francis has filed an Amended Petition for Writ of Habeas Corpus

under 28 U.S.C. § 2254 (Doc. 2).  Mr. Francis challenges his state court conviction and sentence

for first degree murder, asserting 13 grounds for relief.  Generally, Mr. Francis challenges the

Kansas trial court's pretrial rulings, its evidentiary rulings at trial, and its jury instructions.  Mr.

Francis also raises a *Brady* claim, and several claims for ineffective assistance of trial, appellate,

and post-conviction counsel.  Since his conviction almost 20 years ago, the Kansas appellate

courts have considered Mr. Francis's claims five times—on direct appeal of his conviction and in

two separate post-conviction proceedings.  Various attorneys have represented Mr. Francis over

the years in his state proceedings.  Represented by counsel once again, he now seeks federal

habeas relief.  The matter is fully and thoroughly briefed for the court's decision.[2]  For reasons

explained below, the court denies Mr. Francis's Amended Petition.

---

[1]    In its most recent Memorandum and Order, dated May 4, 2022, the court updated the case's caption to name Lansing Correctional Facility Warden Shannon Meyer as one of the respondents.  Doc. 16 at 1 n.1.  But the State advises that Chandler Cheeks now serves as the warden at Lansing.  Doc. 18 at 1 n.1.  So, the court updates the caption once again.

[2]    After the State filed its Answer and Return (Doc. 7), Mr. Francis filed an 83-page Traverse (Doc. 12).  The Traverse contained all of Mr. Francis's legal arguments for relief, which he hadn't raised in his

I.    **Background**

The Kansas Court of Appeals summarized the facts of Mr. Francis's state court

conviction this way:

> In 1997, Clem Hollingsworth IV was charged with the murder of Francis'[s] cousin. A few weeks after the murder, Francis stated on a three-way telephone call [with Ms. Sharon Hollingsworth—Mr. Hollingsworth's mother—and Mr. Corey Shannon—a friend of Mr. Francis's and Mr. Hollingsworth's] that he intended to "get" either Hollingsworth or "the next thing closest to him." About 8 months later, in February 1998, Francis and a number of others visited a bail bondsman named James "Tony" Gillihan and attempted to secure Hollingsworth's release from jail. They first offered $5,000, but then increased the total to $7,500, explaining to Gillihan that Hollingsworth was "not going to be on the bond very long" and that "as soon as they find Hollingworth's body, you're off the bond." Gillihan refused to involve himself.
>
> Shortly thereafter, Hollingsworth's mother paid the bond and secured his release. Less than a day later, while Hollingsworth, his mother, and a friend drove home from a casino, a car pulled up close beside them on Shawnee Mission Parkway in Johnson County, Kansas. Hollingsworth's mother recognized Francis in the other car's passenger seat. Hollingsworth commanded her to duck, and gunfire began to pepper the Hollingsworth's car. Hollingsworth's mother attempted to escape the car, but the shooting continued. By the time she pulled into a gas station, Hollingsworth was bleeding, and he was pronounced dead at the hospital. An investigation determined that at least five different guns were used in the shooting; four guns, including one that could have fired a bullet that had been retrieved from Hollingsworth's body, were discovered during a search of Francis'[s] residence. Francis was charged with and ultimately convicted of first-degree premeditated murder.

*Francis v. State*, 337 P.3d 71 (table), 2014 WL 5312932, at *1 (Kan. Ct. App. Oct. 10, 2014)

(*Francis IV*) (quoting *State v. Francis*, 145 P.3d 48, 56 (Kan. 2006) (*Francis I*)) (quotation

cleaned up).

In 2004, the Johnson County District Court sentenced Mr. Francis to life in prison, with

no possibility of parole for 40 years—otherwise known as the "Hard 40." Mr. Francis appealed,

---

Amended Petition. As explained in a previous Memorandum and Order, our court hasn't looked kindly on a § 2254 petitioner's choice to reserve his legal arguments until the Traverse. *See* Doc 16 at 3. But, rather than strike the Traverse, as the State requested, the court allowed the State to file a Sur-reply. It did. *See* Doc. 18. The matter now is fully briefed for decision.

asserting several errors before, during, and after his jury trial, including objections to jury instructions, evidentiary rulings, and the district court's rejection of his post-trial *Brady* claim that the State had failed to disclose material impeachment evidence of a key witness. The Kansas Supreme Court rejected Mr. Francis's challenges and affirmed his conviction. *See generally Francis I*, 145 P.3d 48.

In 2007, Mr. Francis filed his first post-conviction motion under Kan. Stat. Ann. § 60-1507, alleging ineffective assistance of trial counsel. The Johnson County District Court summarily denied the motion. But the Kansas Court of Appeals, concluding that "substantial issues of fact remain[ed]" about "whether trial counsel was ineffective[,]" reversed and remanded for an evidentiary hearing on Mr. Francis's claims. *Francis v. State*, 206 P.3d 563 (table), 2009 WL 1312561, at *5 (Kan. Ct. App. May 8, 2009) (*Francis II*).

On remand, the district court permitted Mr. Francis to assert two more claims for ineffective assistance of trial counsel. Then, after an evidentiary hearing on those claims, the district court denied his § 60-1507 motion. The Kansas Court of Appeals affirmed. *See Francis v. State*, 286 P.3d 239 (table), 2012 WL 4794595 (Kan. Ct. App. Oct. 5, 2012) (*Francis III*).

Shortly afterward, Mr. Francis filed a second § 60-1507 motion, this time asserting claims for ineffective assistance of appellate and post-conviction counsel. The Johnson County District Court summarily denied the motion. The district court also denied as untimely Mr. Francis's motion to amend his § 60-1507 motion to include allegations about his trial counsel's conflict of interest and an allegedly fraudulent waiver of that conflict. The Kansas Court of Appeals affirmed the summary denial of the claims raised in this § 60-1507 motion. But it reversed the decision denying the motion to amend and remanded for the district court to

consider whether Mr. Francis properly could amend his § 60-1507 motion. *See Francis IV*, 2014 WL 5312932, at *10.

After remand, Mr. Francis filed several motions:  one seeking the untimely amendment of his second § 60-1507 motion, and others seeking relief from judgment and correction of a purportedly illegal sentence.  The district court held two separate hearings on those motions and denied each.  The Kansas Court of Appeals affirmed across the board. *See Francis v. State*, 459 P.3d 837 (table), 2020 WL 1329220 (Kan. Ct. App. Mar. 20, 2020) (*Francis V*).  And, on September 30, 2020, the Kansas Supreme Court denied review, bringing Mr. Francis's lengthy state post-conviction proceedings to a close.

Mr. Francis timely filed his federal habeas Petition under § 2254 on March 15, 2021 (Doc. 1).[3]  He filed an Amended Petition on March 29, 2021 (Doc. 2).

## II.     Legal Standard

A federal court reviews a habeas petitioner's challenge to a state court's decisions under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Lockett v. Trammell*, 711 F.3d 1218, 1230 (10th Cir. 2013).  AEDPA "requires federal courts to give significant deference to state court decisions" on the merits. *Id.*  A federal court may not grant a petitioner habeas relief for "any claim that was adjudicated on the merits in State court proceedings" unless the petitioner can show that the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

---

[3]       This isn't Mr. Francis's first § 2254 petition.  In June 2013, while his second § 60-1507 motion was pending in state court, Mr. Francis filed a § 2254 petition in our court.  Mr. Francis sought to stay the federal habeas proceedings while he exhausted his remaining pending state claims.  But Judge Crow dismissed the Petition "without prejudice to [Mr. Francis] filing a federal habeas corpus petition once he has fully exhausted all available state court remedies." *Francis v. Pryor*, No. 13-3110-SAC, 2014 WL 298628, at *1 (D. Kan. Jan. 28, 2014).

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

The statute's operative phrase—"clearly established Federal law"—refers to Supreme Court holdings, not dicta. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). "A state court decision is 'contrary to' the Supreme Court's clearly established precedent 'if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (alteration in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is "an 'unreasonable application' of clearly established federal law if it 'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case.'" *Lockett*, 711 F.3d at 1231 (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)).

Federal habeas relief is appropriate "only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents." *Frost*, 749 F.3d at 1223 (quotation cleaned up). Stated another way, "[i]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Id.* at 1226 (quotation cleaned up). In sum, "a federal court's review of a state court's decision under § 2254(d) is exceedingly deferential." *Eaton v. Pacheco*, 931 F.3d 1009, 1018 (10th Cir. 2019).

## III.    Analysis

Mr. Francis asserts 13 grounds for federal habeas relief. The court considers some of these claims on the merits, below. But, for complicated reasons explained later, the court can't consider other claims because they're procedurally barred. The court will begin with the merits

claims before delving into the procedural morass at the end of this Order.  Also, for clarity, the

court follows the numerical labels that Mr. Francis attached to each ground for relief in his

Amended Petition.  So, lest there's any confusion, the court begins with Ground Three and

proceeds chronologically through the rest of the merits claims:  Grounds Six, Eight, Ten, Eleven,

and Thirteen.  And, because nothing in federal habeas review is particularly simple, the court

circles back to the beginning of the Amended Petition and concludes by explaining why Mr.

Francis procedurally defaulted on Grounds One, Two, Five, Seven, and Nine.  It also explains

why Ground Twelve, his gateway claim of actual innocence, fails to excuse the procedural

defaults.[4]  The court begins.

### A.    Ground Three:  *Brady* Violation

In his third ground for relief, Mr. Francis argues the state trial court erred by denying his

new trial motion based on alleged exculpatory evidence.  This argument involved the testimony

of Mr. Tony Gillihan—the bail bondsmen who testified that Mr. Francis and others had asked

him to pay Mr. Hollingsworth's bond and told him he shouldn't worry about losing money

because "[a]s soon as they find his body, you're off the bond."  *Francis I*, 145 P.3d at 56.  Mr.

Francis argued that "the State knew Tony Gillihan, a significant witness, suffered from

posttraumatic stress disorder that caused him to confuse the events of his son's murder with the

facts of [Mr. Francis's] case."  *Id.* at 70.  Mr. Francis appealed this issue to the Kansas Supreme

Court, arguing that Gillihan's condition "was material impeachment information that the State

was obligated to disclose to him" and failure to do so violated *Brady v. Maryland*, 373 U.S. 83

---

[4]    For those counting along, the court hasn't forgotten Ground Four.  Mr. Francis has withdrawn
Ground Four—asserting that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights
when it "allowed the prosecutor to elicit hearsay statements from Corey Shannon and [Mr. Francis]
through the testimony of [Ms.] Hollingsworth."  Doc. 2 at 12; Doc. 12 at 33 ("The Petitioner withdraws
Claim 4, and does not wish to pursue it in this federal habeas proceeding.").

(1963) and *Giglio v. United States*, 405 U.S. 150 (1972).  *Francis I*, 145 P.3d at 70–71.  The Kansas Supreme Court rejected this argument on the merits.  *See id.* at 71–72.  The court thus analyzes whether that decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

*Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Extending *Brady*'s reach, *Giglio* held that "[i]mpeachment evidence . . . falls within the *Brady* rule."  *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. at 154).  So, to prove a *Brady* violation, a defendant must show that the government suppressed favorable and material impeachment evidence.  But, impeachment evidence is only material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quotation cleaned up).  As the Supreme Court has stressed, a "reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial."  *Id.* (quotation cleaned up); *cf.* at 76 (explaining that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict" (citing *United States v. Agurs*, 427 U.S. 97, 112–13 & n.21 (1976))).

The Kansas Supreme Court thoroughly analyzed this issue as follows, beginning with a synopsis of Detective Michael Daniels's testimony.  Mr. Daniels was the lead case agent for the State in Mr. Francis's case.

> We know from Daniels' testimony at the motion hearing that just minutes before
> Gillihan testified at Francis' trial he told Daniels about having posttraumatic stress

disorder and "confusing a couple issues between his son's death and what he was going to testify about." . . .  For the purpose of analyzing this issue, it is not important whether the prosecutor was present when Gillihan talked about having posttraumatic stress disorder because *Brady* suppression occurs even when the government fails to turn over evidence that is not known to the prosecutor if it is known to police. *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995).  The evidence must be clearly exculpatory and the evidence must be material so that its suppression was clearly prejudicial to the defendant in order for the court to grant a Brady motion.  [*State v.*] *Aikins*, 261 Kan. [346,] 382, 932 P.2d 408 (citing *State v. Humphrey*, 258 Kan. 351, 355, 905 P.2d 664 (1995)).

Gillihan was a key witness in this case.  He gave important testimony, namely that Francis was one of several people who wanted to pay Clem Hollingsworth's bond in order to get him released from jail and that they had assured Gillihan he would not lose any money because he would be off the bond when Hollingsworth's body was found.  A factfinder reasonably could infer from this testimony that Francis and several people intended to kill Hollingsworth once he was released from jail.  Gillihan's reliability was important.  Evidence that Gillihan said he suffered from a disorder that affected his ability to distinguish events of his son's murder from the facts pertaining to Hollingsworth's murder might have affected his credibility had he been questioned about it on cross-examination.

In *Youngblood v. West Virginia*, 547 U.S. 867, [869–70], 126 S. Ct. 2188, 2190, 165 L.Ed.2d 269, 272–73 (2006), the United States Supreme Court stated that what is required for a showing of materiality is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  But a demonstration that disclosure of the suppressed evidence ultimately would have resulted in the defendant's acquittal is not required.  In the words of the Supreme Court, "[t]he reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [*Kyles*, 514 U.S.] at 435, [115 S. Ct. 1555]."  547 U.S. at [870], 126 S. Ct. at 2190, 165 L.Ed.2d at 273.

On its face, Gillihan's statement that he was confusing a couple of issues in his son's death with ones in this case seems to undermine the credibility of his testimony.  But closer scrutiny does not confirm the impression.  Gillihan did not witness the murder and had no knowledge of the actual murder.  The materiality of his testimony was only in showing that Francis, along with several associates, intended to kill Hollingsworth.  His significant testimony was that, in trying to convince Gillihan to discount Hollingsworth's bond, Francis and his associates stated that Hollingsworth would be dead shortly after he was released from jail.  These circumstances—would-be murderers trying to talk the bondsman into having their target released from jail so that they can kill him—surely are not commonplace, and it is highly unlikely that circumstances similar enough to be confused occurred in the murder of Gillihan's son.  It would be even less likely that

the would-be murderers of Gillihan's son would talk to Gillihan in trying to get their target released from jail in order to kill him.

Defendant failed to develop a record of what issues Gillihan claimed to be confusing.  From the existing record, the court reasonably may infer that whatever confusion Gillihan might have had did not affect his testimony about being visited by Francis and, therefore, would not have been useful in impeaching the witness'[s] significant testimony.  Moreover, as noted by the trial judge, Gillihan's testimony was consistent throughout—during the police investigation, at preliminary hearing, and at trial.  The consistency of the witness' account would have been a powerful rehabilitation tool if his credibility had been impeached.  Thus, it is not a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the trial would have been different.  Due process was not violated, and the trial court did not err in refusing to grant Francis' motion to dismiss.

*Francis I*, 145 P.3d at 71–72.

Mr. Francis argues that the Kansas Supreme Court unreasonably applied *Brady* to his case's facts.  The court disagrees.  The Kansas Supreme Court identified the correct legal standard and reasonably applied it to Mr. Francis's claim.  Mr. Francis certainly disagrees with the Kansas Supreme Court's conclusion.  *See* Doc. 12 at 44 ("The Kansas Supreme Court's 'inference' that Gillihan's PTSD would not have affected his ability to recall and testify about the alleged attempted bonding out is unwarranted speculation, and an unreasonable interpretation and application of *Brady* to the facts of this case.").  But even accepting that some jurists might see things the way Mr. Francis does, the mere possibility of disagreement with the Kansas Supreme Court's decision is not a basis for § 2254 relief.  Indeed, "if 'fairminded jurists could disagree on the correctness of the state court's decision,' then the federal court must defer to the state court."  *Browning v. Trammell*, 717 F.3d 1092, 1102 (10th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *see also Frost*, 749 F.3d at 1226 ("If some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." (quotation cleaned up)).

Here, Mr. Francis hasn't cleared the high bar that § 2254 sets.  He hasn't shown that the Kansas Supreme Court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.  Mr. Francis cites no Supreme Court authority foreclosing the means used by the Kansas Supreme Court to decide his claim.  And the only Tenth Circuit case he invokes—*United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009)—is inapposite.  That case addressed a *Brady* claim on direct appeal from a federal court conviction.  *See id.* at 1267.  So, § 2254's "exceedingly deferential" review standard didn't come into play.  *Eaton*, 931 F.3d at 1018.[5]

While Mr. Francis doesn't cite it, *Browning v. Trammell*, 717 F.3d 1092 (10th Cir. 2013), is more illuminating.  There, the Circuit held that a state court's rejection of a *Brady* claim was unreasonable even under § 2254's stringent standard.  The late-disclosed impeachment evidence in *Browning*—that the central prosecution witness "blurred reality and fantasy" and "suffered from memory deficits," *id.* at 1094—is similar enough to the late-disclosed information at issue here to warrant discussion.  But the key difference between this case and *Browning* is the evidence's materiality.  In *Browning*, the Tenth Circuit stressed how "indispensable" the witness's testimony was to the case, and how "all sides knew that Browning's fate turned on [the witness's] credibility."  *Id.* at 1106.  Because discrediting that witness "was really the only possible defense[,]" the Circuit held that it was "difficult to see how the [state] courts could

---

[5]     Nevertheless, in *Robinson*, our Circuit concluded that undisclosed impeachment evidence that a witness "was suffering from auditory hallucinations, seeing things out through the window that [were] not really there, and possibly experiencing psychosis" was material to the defense.  583 F.3d at 1272.  But that was so because the witness's "testimony was central—indeed essential—to the government's case."  *Id.* at 1271.  In essence, the Circuit explained, "the guilty verdict in [the] case depended upon the [witness's] testimony."  *Id.*  As explained in this section, the guilty verdict in Mr. Francis's case didn't hinge on Mr. Gillihan's testimony.

reasonably conclude there was nothing material about" psychological records showing that the witness "was known to blur reality and fantasy and project blame onto others."  *Id.*

That's not this case, though.  While Mr. Gillihan's testimony was important—a fact recognized by the Kansas Supreme Court—he wasn't an indispensable witness, like the *Browning* witness.  *Compare Francis I*, 145 P.3d at 72 ("Gillihan did not witness the murder and had no knowledge of the actual murder."), *with Browning*, 717 F.3d at 1096 ("No direct evidence besides [the witness's] testimony connected Browning to the crime.  The State's case therefore stood or fell largely on [the witness's] eyewitness testimony and its credibility.").  Nor did Mr. Francis's entire defense hinge on impeaching Mr. Gillihan—a key circumstance in *Browning*. Instead, Mr. Francis merely speculates about the importance of Mr. Gillihan's testimony to the jury.  *See* Doc. 12 at 44–45 (arguing that the jury may have premised its guilty verdict on "an improper aiding and abetting theory based upon Gillihan's testimony" and under that theory "Gillihan's credibility would have been monumental in the eyes of the jury," but, in any event, "Gillihan was a key witness for the State, and impeachment of his credibility would have been crucial to [Mr. Francis's] right to a fair trial").  This argument can't bring Mr. Francis's case within *Browning*'s scope, where no fairminded jurist could agree with the state court's decision. The Kansas Supreme Court reasonably applied *Brady* to this case's facts.  The court thus denies Mr. Francis's third ground for federal habeas relief.

### B.  Ground Six:  Trial Court's Denial of Motion to Suppress

In his sixth ground for relief, Mr. Francis argues the trial court erred by denying his motion to suppress items seized from his home.  He asserts there were several errors with the search warrant and its supporting affidavit.

But federal habeas relief isn't available on this ground.  The Supreme Court held long ago "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnotes omitted).  Here, Mr. Francis has received an opportunity for full and fair litigation of his Fourth Amendment claim.  *See Francis I*, 145 P.3d at 57–63 (analyzing, at length, Mr. Francis's Fourth Amendment challenges and ultimately rejecting them).  And he concedes that is so.  Doc. 12 at 46 ("The Petitioner admits that he received a full and fair opportunity to litigate his Fourth Amendment search warrant issues in Kansas state courts; consequently, habeas relief is likely not available on this claim.").  As a result, the court denies Mr. Francis's sixth ground for federal habeas relief.

## C.    Ground Eight:  Sufficiency of the Evidence

Mr. Francis's eighth ground for federal habeas relief contends that the trial court violated his Fifth and Fourteenth Amendment rights when it found there was sufficient evidence to support a conviction and thus denied his motion for judgment of acquittal.  Mr. Francis presented this issue to the Kansas Supreme Court on direct appeal.  It rejected his argument:

> Francis contends that there was insufficient evidence to support his conviction of first-degree murder.  When the sufficiency of the evidence is challenged in a criminal case, this court reviews all the evidence viewed in the light most favorable to the prosecution.  The evidence is sufficient if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.  In its review, the court does not pass upon the credibility of witnesses or weigh conflicting evidence.  *State v. Lowe*, 276 Kan. 957, 965, 80 P.3d 1156 (2003).

> Francis argues that the only evidence tying him to the crime scene was Sharon Hollingsworth's testimony, and he questions her credibility.  He also questions Gillihan's credibility.  As stated, however, the court does not pass upon the credibility of witnesses in its review of the evidence.

The evidence showed that Francis tried to persuade Gillihan to discount Clem Hollingsworth's bond by telling Gillihan that he would not be obligated for the money very long, just until Hollingsworth's body was found.  Francis could have known when Hollingsworth's mother got him released from jail because Francis' aunt was notified.  Sharon Hollingsworth identified Francis as one of the persons in the vehicle that drove alongside her and her son and fired into their car. Francis' house-arrest monitor was disabled at the time of Clem Hollingsworth's murder.  This evidence, viewed in the light most favorable to the prosecution, convinces the court that a rational factfinder could have found Francis guilty beyond a reasonable doubt of the first-degree murder of Clem Hollingsworth.

*Francis I*, 145 P.3d at 72–73.

A federal habeas court "review[s] § 2254 sufficiency-of-the-evidence claims under a 'twice-deferential standard.'"  *Russell v. Bryant*, 781 F. App'x 721, 725 (10th Cir. 2019) (quoting *Parker v. Matthews*, 567 U.S. 37, 43 (2012)).  The state court first defers to the jury because "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). So, the state court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  *Id.*  And then, at the second level of deference, a federal habeas court reviewing a state court's decision ordinarily must defer to the state court.  That's because "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable."  *Id.* (quotation cleaned up).

This standard is an incredibly high one.  Mr. Francis fails to meet it.  He merely highlights all the evidence he presented at trial to support his defense.  The jury plainly rejected that defense.  That was their right as the ultimate factfinder.  Again, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Id.*  The Kansas Supreme Court reviewed the evidence presented at trial and determined that a rational factfinder could've found Mr. Francis guilty beyond a reasonable doubt of first-

13

degree murder.  That conclusion wasn't objectively unreasonable.  And so, the court denies Mr.

Francis's eighth ground for federal habeas relief.

### D.    Ground 10:  Ineffective Assistance of Trial and Appellate Counsel

Mr. Francis contends his trial counsel was ineffective in six different ways.  Mr. Francis

also asserts that the same counsel provided ineffective assistance when he represented Mr.

Francis on direct appeal.  Mr. Francis presented these issues to the Kansas Court of Appeals in

both of his § 60-1507 motions.  The Kansas Court of Appeals rejected his claims in *Francis III*,

*Francis IV*, and *Francis V*.  Mr. Francis now argues that the Kansas Court of Appeals

unreasonably applied Supreme Court precedent when it rejected his claims.  The court disagrees.

It addresses each of Mr. Francis's arguments, below.  But first, it recites the applicable legal

standards for ineffective assistance claims.

#### 1.  Legal Standards for Ineffective Assistance of Counsel

To establish a claim for ineffective assistance of counsel, a petitioner must show two

things.  *First*, he must show that his counsel's performance fell below an objective standard of

reasonableness, *i.e.*, that "counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland v. Washington*, 466

U.S. 668, 687 (1984).  *Second*, a petitioner must show that "the deficient performance prejudiced

the defense" *i.e.*, that but-for counsel's errors, the proceedings would have turned out differently.

*Id.*

When analyzing an ineffective assistance claim, courts apply "a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

[petitioner] must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy."  *Id.* at 689 (quotation cleaned up).  Add to that

presumption § 2254's deferential review of state court decisions—that a court cannot grant federal habeas relief unless the state court decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quotation cleaned up). Thus, when "a habeas petitioner alleges ineffective assistance of counsel, deference exists both in the underlying constitutional test (*Strickland*) and [§ 2254's] standard for habeas relief, creating a 'doubly deferential judicial review.'" *Harris v. Sharp*, 941 F.3d 962, 973–74 (10th Cir. 2019) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "Under this double deference," the court considers "'whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard.'" *Id.* at 974 (quoting *Harrington*, 562 U.S. at 105 (other citation omitted)). When considering these claims in a habeas petition, the Supreme Court instructs federal courts "to afford both the state court and the defense attorney the benefit of the doubt." *Woods*, 578 U.S. at 117 (quotation cleaned up).

In Mr. Francis's various cases, the Kansas Court of Appeals correctly recited the legal standards governing Mr. Francis's ineffective assistance of counsel claims. *See Francis III*, 2012 WL 4794595, at *2; *Francis IV*, 2014 WL 5312932, at *5; *Francis V*, 2020 WL 1329220, at *10–11. The court thus proceeds to analyze whether the Kansas Court of Appeals unreasonably applied those standards to Mr. Francis's claims.

### 2. Trial Counsel's Conflict

Mr. Francis's lead ineffective assistance argument relies on his trial counsel's brief representation of Mr. Corey Shannon more than one year before he represented Mr. Francis at trial. The State called Mr. Shannon to testify at Mr. Francis's preliminary hearing. The Kansas Court of Appeals summarized the facts that created the conflict:

> At Francis' preliminary hearing on April 5, 2002, the district court appointed Thomas [later, Mr. Francis's trial counsel] to represent Shannon as special counsel to determine whether Shannon could assert his Fifth Amendment right against self-incrimination.  After an in-camera interview, the district court allowed Shannon to invoke his Fifth Amendment right. Thomas subsequently met with Francis on March 21, 2003 [almost one year after the preliminary hearing].  Three days later, Francis signed a waiver of any conflict of interest that could result from Thomas's prior representation of Shannon.   On March 26, 2003, Thomas entered an appearance in Francis' case.  Thomas filed a comparable waiver of conflict of interest signed by Shannon on September 26, 2003.
>
> At the [Kan. Stat. Ann.] 60-1507 evidentiary hearing, Thomas testified that he represented Shannon for approximately 1 1/2 hours for the limited purpose of Shannon asserting his Fifth Amendment right.  Thomas testified that he only spoke with Shannon for 15 to 20 minutes during this time.  Thomas also testified at the scheduling conference that during his brief interaction with Shannon he did not learn anything he could use to cross-examine Shannon.

*Francis III*, 2012 WL 4794595, at *3.  Based on these facts, Mr. Francis argued that "Thomas' loyalty to Shannon created a conflict of interest that adversely affected Thomas' representation because it prevented him from . . . attacking Shannon's credibility." *Id.*

As explained above, an ineffective assistance claim ordinarily requires a petitioner to show that counsel's deficient performance prejudiced him.  But, when a petitioner bases his ineffective assistance claim on his counsel's conflict of interest, he need not show prejudice. Instead, he need only "establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  The Supreme Court has explained that the "purpose" of this "exception[ ]" from *Strickland*'s ordinary prejudice requirement is "to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel."  *Mickens v. Taylor*, 535 U.S. 162, 176 (2002); *see also Sullivan*, 446 U.S. at 348 (recognizing that "a possible conflict inheres in almost every instance of multiple representation").  But, unless "a defendant shows that his

counsel *actively* represented conflicting interests, he has not established the constitutional

predicate for his claim of ineffective assistance."  *Sullivan*, 446 U.S. at 350 (emphasis added).[6]

Applying this standard, the Kansas Court of Appeals rejected Mr. Francis's conflict

claim:

> [T]he transcripts reveal that Thomas did not appear to have reservations impeaching Shannon if necessary, as evidenced during the cross-examination of Sergeant Mike Daniels where Thomas elicited testimony that Shannon was one of three suspects in an unrelated 1995 murder.  As the district court noted, even had Francis been represented by another counsel, that counsel would not have been able to elicit testimony from Shannon to attack Shannon's credibility because Shannon clearly asserted his Fifth Amendment right.  When a witness validly invokes his or her Fifth Amendment right against self-incrimination, the witness is unavailable for cross-examination and any prior statements constitute inadmissible hearsay unless a statutory exception is applicable.  *See State v. Palmer*, 8 Kan. App. 2d 1, 2–3, 657 P.2d 1130 (1982).
>
> Given the record before us, we cannot see that the conflict created by Thomas' brief representation of Shannon, who exercised his constitutional right against self-incrimination, affected Thomas' representation of Francis.  Thus, we conclude that the conflict is not reversible.  *See Boldridge* [*v. State*, 215 P.3d 585, 591 (Kan. 2009) (citing *Mickens*, 535 U.S. at 168)].

*Francis III*, 2012 WL 4794595, at *3–4.

The Kansas Court of Appeals then concluded with the key aspect of its analysis—that

both Mr. Francis and Mr. Shannon waived any conflict of interest that existed here.  The court

quotes this analysis in full:

---

[6]     As an aside, *Sullivan* involved "multiple" or concurrent representation of three separately tried co-defendants.  The Supreme Court hasn't held that *Sullivan*'s "adversely affect" standard applies to conflicts of interests based on successive representation, which is the case here.  *See Mickens*, 535 U.S. at 176 ("[W]e do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.").  But, nevertheless, the Kansas Court of Appeals applied *Sullivan*'s less stringent "adversely affect" standard to Mr. Francis's claim.  *See Francis III*, 2012 WL 4794595, at *4 ("Given the record before us, we cannot see that the conflict created by Thomas' brief representation of Shannon . . . *affected* Thomas' representation of Francis." (emphasis added)).  So, Mr. Francis received the benefit of any error that occurred.

We note the following written exhibit was filed with the district court:

["]WAIVER OF CONFLICT OF INTEREST

> I, John Francis, acknowledge that Bob L. Thomas has informed me of the possibility of a conflict of interest being created by him representing me in Johnson County Case No. 01CR 0786. Mr. Thomas has provided me with a copy of Kansas Supreme Court Rule 7.1, which relates to Conflicts of Interest. Mr. Thomas has advised me that I can consult with another attorney regarding this matter if I so choose and Mr. Thomas has allowed me sufficient time to do so. By signing this document I waive any conflict of interest that could result from Mr. Thomas' prior representation of Corey Shannon. I understand that if a direct conflict of interest should arise at some point in the future Mr. Thomas would have to seek to withdraw as my attorney. I hereby by [sic] consent to Mr. Thomas' representation of myself with the knowledge of his prior representation of Corey Shannon in the same pending criminal matter."

The record also discloses that Shannon signed a comparable waiver. We cannot ignore the significance of these waivers. These two exhibits show the informed consent given by Francis and the witness, Shannon. Our Supreme Court has recognized that the Code of Judicial Conduct (2011 Kan. Ct. R. Annot. 683) and the Kansas Rules of Professional Conduct (2011 Kan. Ct. R. Annot. 407) for attorneys provide for a waiver of a conflict of interest in circumstances where "all parties give informed consent to the conflicted representation and where this consent is memorialized in writing." *Boldridge*, 289 Kan. at 626.

In our view, the district court did not err when it ruled that this conflict was not reversible.

*Id.* at *4.

Mr. Francis provides no authority showing that, in reaching its conclusion, the Kansas Court of Appeals unreasonably applied clearly established Supreme Court precedent. The only binding and factually analogous authority he provides—*Church v. Sullivan*, 942 F.2d 1501 (10th Cir. 1991)—actually *supports* the Kansas Court of Appeals's decision. There, the defense theory at trial cast blame for the offense on a government witness. *Id.* at 1510–11. The only problem was that defense counsel previously had represented that witness in a related case. *Id.* at 1511. So, defense counsel "could not fully cross-examine him . . . about any privileged information he

18

received" during the representation. *Id.* Our Circuit concluded that it was "difficult to envision circumstances more fraught with inherent conflict than [one] where an appointed attorney representing a reluctant defendant must present a defense theory inculpating the attorney's former client, particularly where the former representation was factually intertwined with the criminal defendant's case." *Id.* But, crucially, the Circuit remanded for an evidentiary hearing to "resolve [a] key concern"—whether the defendant had "waived his right to counsel free of such conflicts." *Id.* at 1512 (quotation cleaned up) (citing *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978) ("[A] defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests.")).

Here, there's no question: Mr. Francis waived his right to conflict-free counsel. Given the binding authority discussed above, the Kansas Court of Appeals reasonably concluded that Mr. Francis's ineffective assistance claim failed because he had waived any conflict of interest in the counsel that he retained to represent him. *See Francis V*, 2020 WL 1329220, at *11 ("Francis testified that he was aware Thomas previously represented Shannon when he decided to retain Thomas to represent him at trial. Francis also informed the district court in 2003 that he understood the potential consequences of the conflict, even those that could arise due to Shannon's later involvement in the case, and he still wanted to retain Thomas as his attorney. Francis signed his conflict of interest waiver and orally advised the district court that he desired to waive any conflict with Thomas' prior representation of Shannon.").

Mr. Francis's final arguments on this subject contend that his waiver of the conflict was ineffective and fraudulent. Neither argument is availing.

*First*, the record in this case confirms that Mr. Francis's waiver was knowing and voluntary. To begin, there's the written waiver, quoted in full above. And then, after Mr.

Francis signed the waiver and before trial, the district court conducted this colloquy on the issue

with counsel and Mr. Francis:

> MR. THOMAS:  Judge, for the record, I mean, there should be in the court file a waiver that Mr. Francis has executed.  It was filed and I provided a copy to the State. . . . Judge, I discussed this at length with Mr. Francis.  I don't believe there is a conflict, and the reason being the thing that caused the conflict was a conversation between those two individuals.  So I don't know anything about— even let's say hypothetically the Government granted Corey Shannon complete immunity and put him on the witness stand.  Due to my 30 minutes of representation of Mr. Shannon, I don't know anything about him other than what John Francis knows or other than what Corey Shannon knows.  I don't know anything I could use to cross-examine him, and that's the heart of—

> THE COURT:  The point is, if he does testify, you would be ordered to represent the interest of Mr. Francis in his trial.  You would be in a position of having to cross-examine Mr. Shannon who you formerly represented in this case.

> MR. THOMAS:  That's correct, but I don't know anything about [Shannon] due to my representation that I would even have the opportunity to use against him which is the heart of conflict of interest, not to be disloyal to a previous client.  And the fact is, he is at best an uncooperative witness for the Government.  I don't see how I would be acting against his interests in any event.

> …

> THE COURT:  Mr. Francis, I see that you have signed a letter or a document indicating that you are waiving that conflict of interest that is being discussed here in court.  Have you had full opportunity to discuss this situation with Mr. Thomas?

> THE DEFENDANT:  Yes.

> THE COURT:  You understand the potential conflict that presents itself here if Mr. Shannon were to be involved in this case further?

> THE DEFENDANT:  Yes.

> THE COURT:  Is it still your decision that you're going to waive any conflict of interest that might exist by Mr. Shannon's later involvement in this case?

> THE DEFENDANT:  Yes, sir.

*Francis V*, 2020 WL 1329220, at *3.  Finally, the "district court appointed John Jenab as a

special counsel to advise Francis regarding the conflict of interest issue 'and make sure this is

something that is really in your best interest to do.'"  *Id.*  Mr. Francis then proceeded to trial with Mr. Thomas as his trial counsel.

The Kansas courts' handling of this conflict issue was eminently reasonable.  Mr. Francis challenges how thoroughly his counsel and the trial court explained the waiver's consequences. But that just won't cut it for § 2254 relief.  Mr. Francis must show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103. He doesn't come close to meeting that standard.

*Second*, Mr. Francis boldly contends that the waiver signed by Mr. Shannon was fraudulent.  Mr. Francis sought to add this claim as an untimely amendment to his second § 60-1507 motion.  After considering, at length, whether denial of the amendment would result in a manifest injustice, the Kansas Court of Appeals held that his motion to amend was untimely under Kan. Stat. Ann. § 60-1507(f)(3) and that Mr. "Francis failed to show that the time period should be extended in order to prevent a manifest injustice."  *Francis V*, 2020 WL 1329220, at *16.  The Kansas Court of Appeals thus rejected Mr. Francis's fraudulent waiver claim on an independent and adequate state procedural bar.  *See Lowe v. Allbaugh*, 689 F. App'x 882, 885 (10th Cir. 2017) (recognizing that "untimely" filing of ineffective assistance of counsel claim was "an independent and adequate state rule" barring federal habeas relief); *see also Anthony v. McKune*, No. 12-3022-SAC, 2014 WL 1116762, at *9 (D. Kan. Mar. 20, 2014) (concluding that this ruling from Kansas Court of Appeals—that ineffective assistance claim was untimely and no exception applied—was an independent and adequate state law ground barring federal habeas relief).  In that circumstance, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of

federal law, or demonstrate that failure to consider the claims will result in a fundamental
miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  As explained more
below, Mr. Francis doesn't satisfy either exception.  Thus, the independent and adequate state
procedural bar remains.  The court can't consider the fraudulent waiver claim on the merits.

"In short, the conflict issue involving Shannon has been at the forefront of this litigation
for years." *Francis V*, 2020 WL 1329220, at *9.  Having reviewed the relevant decisions and the
state court record, the court concludes that the Kansas Court of Appeals reached a decision on
the conflict issue that isn't contrary to or an unreasonable application of clearly established
Supreme Court precedent.

### 3.   Trial Counsel's Strategic Decisions

Next, Mr. Francis asserts five more challenges to his trial counsel's performance.  He
presented these claims to the Kansas Court of Appeals in his first § 60-1507 motion.  The district
court summarily denied the claims, but the Kansas Court of Appeals reversed and remanded with
instructions to conduct an evidentiary hearing.  *Francis II*, 2009 WL 1312561, at *5.  The district
court then held a hearing and rejected the claims once again.  In a thorough opinion, the Kansas
Court of Appeals affirmed, reasoning that counsel's "'[s]trategic choices made after thorough
investigation of law and facts relevant to plausible options are virtually unchallengeable.'"
*Francis III*, 2012 WL 4794595, at *6 (quoting *Alderson v. State*, 138 P.3d 330, 335 (Kan. Ct.
App. 2006)); *see also id.* at *8 ("This court is in no position to question [trial counsel's] strategic
decisions." (citing *Strickland*, 466 U.S. at 687)).

The Kansas Court of Appeals identified the correct rule of law from Supreme Court
precedent:  "strategic choices made after thorough investigation of law and facts relevant to
plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690.  And, the Kansas

Court of Appeals reasonably applied that legal rule to all five of Mr. Francis's remaining claims for ineffective assistance of trial counsel. The court briefly addresses each claim, below.

*First*, Mr. Francis challenges trial counsel's decision not to call Ms. Latosha Hickman, Mr. Francis's ex-wife, as an alibi witness. The Kansas Court of Appeals provided the context:

> At the end of the third day of trial, at approximately 3:35 p.m., Thomas [trial counsel] reiterated to the district court that Hickman would be testifying as an alibi witness, but he needed a continuance because Hickman had failed to show up despite being served with a subpoena and his unsuccessful efforts to communicate with her. The district court granted a continuance until 9 a.m. the next day. The next day of trial, the defense rested without presenting Hickman as an alibi witness.

*Francis III*, 2012 WL 4794595, at *4. At the § 60-1507 hearing, there was a conflict between trial counsel's testimony and Ms. Hickman's testimony about why she failed to testify:

> Thomas testified that he located Hickman during the continuance and had explained to her on the phone that she needed to testify the next day whether Francis was with her on the day Hollingsworth was killed. Thomas testified that Hickman replied, "I don't remember that," meaning she did not "remember that day, period." When Thomas told Hickman that she was subject to subpoena and would be brought in to testify as an alibi witness, Hickman replied, "If you put me on the stand, I'll say I don't remember." At that point, Thomas testified that he made a reasoned decision to tell Hickman not to testify because he believed if Hickman actually testified she did not remember what happened that day it would "make us look foolish and it would hurt John Francis'[s] case."
>
> …
>
> Hickman, however, testified at the evidentiary hearing that she never had any conversations with Thomas about this case and she never received a subpoena to testify. The State, however, presented evidence of a subpoena ordering Hickman to appear at Francis'[s] trial on November 5, 2003, at 9 a.m. Kyle Jones, a private investigator, testified to having personally served Hickman with this subpoena on October 21, 2003.

*Id.* at *5.

The district court ultimately found trial counsel's testimony more credible than Ms. Hickman's. And, the Kansas Court of Appeals, concluding that it was bound by the district court's credibility determination, rejected Mr. Francis's ineffective assistance claim. "Given

Hickman's response to Thomas that she would not corroborate Francis'[s] alleged alibi if forced to testify, substantial competent evidence supports the district court's finding that Thomas made a reasonable tactical decision not to use Hickman as a supporting witness because she could prove hostile and not help Francis'[s] defense." *Id.*

Completely ignoring that reasoning, Mr. Francis argues that trial counsel could've called Ms. Hickman to testify and refreshed her recollection with her past statements to law enforcement stating that Mr. Francis was with her on the day of Mr. Hollingsworth's murder. But this is a challenge to trial counsel's strategy. Counsel's central reason for not calling Ms. Hickman was his judgment that "she could prove hostile and not help [Mr.] Francis'[s] defense." *Id.* That's a strategic choice. And one that the court can't second guess under the "double deference" governing federal habeas review of this claim. *Harris*, 941 F.3d at 974 (reminding that the relevant question for ineffective assistance claims in federal habeas is "'whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard'" (quoting *Harrington*, 562 U.S. at 105 (other citation omitted))). Here, the Kansas Court of Appeals found that counsel's reasons for not calling Ms. Hickman as a witness were reasonable. Because that conclusion also was reasonable, the court must defer to the Kansas Court of Appeals.

*Second*, Mr. Francis challenges trial counsel's decision not to interview three eyewitnesses who were driving near the murder scene. The district court found that the proposed eyewitness testimony from afar was "questionable[,]" inconsistent with forensic evidence, and "was of very little relevance considering Sharon Hollingsworth's identification of Francis." *Francis III*, 2012 WL 4794595, at *6 (quotation cleaned up). Affirming the district court's conclusion, the Kansas Court of Appeals summarized the issue well:

> Here, even if we believe that Thomas'[s] investigation of the potentially exculpatory eyewitness testimony was deficient, Thomas simply made a strategic

> decision not to call [them] to testify.  Thomas had a reasonable belief that [they] had nothing material to offer his defense in furtherance of his trial strategy.  The police reports do not indicate these eyewitnesses could refute Hollingsworth's claim that she saw Francis in the suspect vehicle.  The fact that the victim's car had shattered windows and many bullet holes in it and the forensic evidence indicated the numerous recovered shell casings came from five different weapons clearly impeached the eyewitnesses' credibility.  Given these facts, there was no reasonable probability that eyewitness testimony from a limited vantage point at approximately 3 a.m. about the number of vehicles involved and the make and models of those vehicles would have ultimately affected the outcome of the case.  Simply put, we cannot hold that Thomas was ineffective in his representation of Francis by not calling these witnesses.

*Id.* at *7 (citation omitted).

This conclusion is a reasonable application of clearly established Supreme Court precedent.  *See Strickland*, 466 U.S. at 691 ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").  The court denies federal habeas relief on this ground.

*Third*, Mr. Francis raises yet another challenge to trial counsel's strategy.  This time he challenges trial counsel's failure to investigate and subpoena Mr. Reggie Gant, who trial counsel attempted "to paint . . . as one of several possible suspects" for the murder.  *Francis III*, 2012 WL 4794595, at *8.  But, the Kansas Court of Appeals held that it was in "no position to question [trial counsel's] strategic decisions."  *Id.*  The court need not belabor the point already discussed twice above—Mr. Francis's argument provides no basis for federal habeas relief.

Shifting gears from the argument he made to the state court, Mr. Francis attaches an Affidavit from a private investigator, who interviewed Mr. Gant.  *See* Doc. 12-4.  In it, the investigator reports information that—Mr. Francis claims—could've impeached Ms. Hollingsworth's testimony.  But when conducting "review under § 2254(d)(1)[,]" the court "is limited to the record that was before the state court that adjudicated the claim on the merits."

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  So, the court can't consider this Affidavit and any argument based on it.

    *Fourth*, Mr. Francis asserts another strategic challenge providing no basis for relief.  Mr. Francis faults his trial counsel for not "present[ing] the full picture of the phone records used by the prosecution at trial to conclusively establish [he] was nowhere near the scene of the crime[.]" Doc. 2 at 26.  The Kansas Court of Appeals rejected this challenge as well, explaining that the Kansas Supreme Court had "determined the significance of this [cellphone] evidence previously, when it held that 'the critical issue for the jury would have been the credibility of Sharon Hollingsworth, who identified Francis as being at the murder scene.'"  *Francis III*, 2012 WL 4794595, at *9 (quoting *Francis I*, 145 P.3d at 64).  Thus, "that Francis received a phone call at 10:04 p.m., or where Francis was at the time of this phone call in relation to where Williams was at 10:07 p.m., is not relevant to where Francis was at approximately 3 a.m. when Hollingsworth identified Francis at the murder scene."  *Id.*  Thus, the Kansas Court of Appeals concluded, "Francis suffered no prejudice" from counsel's strategic handling of the phone records.  *Id.*  The Kansas Court of Appeals reasonably applied *Strickland*.

    *Last*, Mr. Francis challenges his trial counsel's handling of ballistics evidence.  Trial counsel retained an expert whose report didn't provide the favorable evidence counsel had hoped it would.  So, he "elected not to have [that expert] testify."  *Id.*  The Kansas Court of Appeals rejected Mr. Francis's argument on this point as another improper "challenge to trial strategy." *Id.*  But, it also held that even if counsel had rendered deficient performance in "failing to do further ballistic testing and have an expert testify, Francis suffered no prejudice."  *Id.*  Other than making conclusory assertions that he was prejudiced, Mr. Francis doesn't engage this holding at all.  Instead, he challenges whether trial counsel's choice fits within *Strickland*'s "virtually

unchallengeable" strategy rubric.  466 U.S. at 690; Doc. 12 at 70–71.  But the strategy analysis

was only part of the Kansas Court of Appeals's holding.  Absent any meaningful challenge to the

prejudice holding by the Kansas Court of Appeals, *Strickland* was reasonably applied.

### 4.   Ineffective Assistance of Appellate Counsel

Finally, Mr. Francis asserts that his appellate counsel was ineffective for failing to argue

that the trial court's aiding and abetting instruction was erroneous under *State v. Engelhardt*, 119

P.3d 1148 (Kan. 2005).  Mr. Francis presented this claim in his second § 60-1507 motion.  The

trial court summarily denied the claim.  And, after a thorough analysis of the issue, the Kansas

Court of Appeals affirmed.  *See Francis IV*, 2014 WL 5312932, at *3–6.  Mr. Francis now

contends that this decision was an unreasonable application of clearly established Supreme Court

law.  It wasn't.

To begin, it's not entirely clear the court can consider this argument now.  The Kansas

Court of Appeals considered whether the failure to raise *Engelhardt* "provide[d] exceptional

circumstances sufficient to allow a second [§ 60-1507] motion."  *Id.* at *3 (explaining that

Kansas "district courts are not required to 'entertain a second or successive motion for similar

relief on behalf of the same prisoner'" (quoting Kan. Stat. Ann. § 1507(c))).  But, failing to raise

*Engelhardt* also was the crux of the ineffective assistance claim.  And the Kansas Court of

Appeals didn't express—at least not explicitly—whether it rejected Mr. Francis's claim on the

merits or, instead, determined the claim was procedurally barred because Mr. Francis hadn't

shown exceptional circumstances.  If the latter, then the court can't consider the claim because it

is subject to an independent and adequate state procedural bar.  *Gleason v. McKune*, No. 11-

3110-SAC, 2012 WL 2952242, at *11 (D. Kan. July 19, 2012) ("The successive motion rule is

firmly established and is regularly followed in Kansas courts.  This is an independent and

adequate state procedural ground which bars this Court's reconsideration of this claim." (citations omitted)).  But, because the State doesn't assert this argument in response to Mr. Francis's Petition, the court, out of an abundance of caution, will address the claim's merits.

This argument centers on the Kansas Supreme Court's decision in *Engelhardt*, "which was decided after Francis' brief was filed on his direct appeal but before oral argument." *Francis IV*, 2014 WL 5312932, at *4.  In that opinion, the Kansas Supreme Court held that the combination of two aiding and abetting instructions—where one instruction included language about aiding and abetting other crimes that were reasonably foreseeable—potentially misled the jury.  *Id.* (discussing *Engelhardt*, 119 P.3d at 1164).  "Because there were other crimes that were charged or could have been charged, such as aggravated battery, the jury could have found, based on the foreseeability language, that Engelhardt was pursuing one of the other crimes but murder was a foreseeable consequence, basically turning the instruction into a felony-murder instruction, lowering the prosecution's burden of proof for premeditated murder."  *Id.* (discussing *Engelhardt*, 119 P.3d at 1164).  Ultimately, though, the Kansas Supreme Court determined that this instructional error was harmless because of overwhelming evidence of guilt. *Id.* (discussing *Engelhardt*, 119 P.3d at 1165).

At Mr. Francis's trial, the district court gave both aiding and abetting instructions that *Engelhardt*, later, would determine as error.[7]  And while Mr. Francis's counsel asserted the

---

[7]    The Kansas Court of Appeals recited those instructions in full:

[T]he district court provided the jury with a premeditated murder instruction as well as two different aiding and abetting instructions.  Instruction 11, which mirrors PIK Crim. 3d 54.05 (Responsibility for Crimes of Another), read:

"A person who, either before or during its commission, intentional [sic] aids, abets, advises, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for

instructional error in Mr. Francis's direct appeal, he didn't cite *Engelhardt*—because the Kansas Supreme Court hadn't decided it yet when he filed his opening brief.  Ultimately, the Kansas Supreme Court rejected the instructional error claim in the direct appeal, concluding that the instructions could not reasonably have misled the jury.  *See Francis I*, 145 P.3d at 68–69.

Then, in Mr. Francis's second § 60-1507 motion, he argued that "had his direct appeal counsel (Thomas) raised *Engelhardt* through a letter of supplemental authority prior to oral argument, the decision would have been different."  *Francis IV*, 2014 WL 5312932, at *5.  The Kansas Court of Appeals rejected this argument:

> [T]he prosecutor's position was that Francis formed the intent to murder Hollingsworth a few days before the murder when he attempted to bond him out and told the bondsman that he would not have to worry about getting his money back because Hollingsworth's body would be found.  Francis had the requisite intent to commit the crime as the principal.  The district court judge further noted that the prosecutor emphasized that Hollingsworth's mother identified Francis as being in the car from which shots were fired at the victim.  The prosecution's theory was clearly that Francis planned and participated with the clear and premeditated intent to murder Hollingsworth.  We also note an additional difference between this case and . . . *Engelhardt* . . . :  In [that] case[ ], there were "other crimes" alleged in addition to premeditated murder—"other crimes" that could have been used to convert the [aiding and abetting other reasonably foreseeable crimes] instruction into a de facto felony-murder instruction.  Here, the only charge was first-degree murder.  There were no "other crimes" to confuse or mislead the jury.

> We have no trouble reaching the same conclusion as the district court.  Even if the [aiding and abetting other reasonably foreseeable crimes] instruction had not been given, there is no reasonable probability that the result would have been different.  The Supreme Court fully examined the instructions given in Francis'[s] direct appeal and also found that based on the evidence the instructions did not mislead

---

> the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

> The second instruction regarding aiding and abetting, Instruction 12, which mirrored PIK Crim. 3d 54.06 (Responsibility for Crimes of Another—Crime Not Intended), read:  "A person who intentionally aids, abets, advises, counsels or procures another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, *if the other crime was reasonably foreseeable.*"

*Francis IV*, 2014 WL 5312932, at *3–4.

the jury. *Francis I*, 282 Kan. at 146, 145 P.3d 48. The motion, files, and records of the case conclusively establish that the Francis is not entitled to relief on a meritless claim regarding ineffective assistance of appellate and 60–1507 counsel. Accordingly, the district court did not err in summarily denying his motion.

*Francis IV*, 2014 WL 5312932, at *6.

Mr. Francis hasn't shown that this decision was an unreasonable application of clearly established Supreme Court precedent. Instead, he speculates about the basis of the jury's verdict. And, he surmises from his speculation that if the jury reasoned as he contends, then the Kansas court's decision was wrong. Doc. 12 at 73–74 ("If the jury premised the Petitioner's guilt solely upon his failure to report a crime before it occurred, then [the aiding and abetting other reasonably foreseeable crimes instruction] would allow them to conclude it was foreseeable that Hollingsworth may die as a result of the Petitioner's failure to report the crime, and not that the Petitioner premediated Hollingsworth's death. As such, the Kansas Court of Appeals'[s] decision that the Petitioner was not prejudiced by the giving of this clearly erroneous jury instruction was contrary to and an unreasonable application of *Strickland* and its progeny."). The problem with this argument is that the court can't speculate about the reasons for the jury's verdict. *See Cavazos*, 565 U.S. at 2 ("[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."); *see also Nanodetex Corp. v. Defiant Techs.*, 349 F. App'x 312, 320 (10th Cir. 2009) (explaining that courts "'will not invalidate a jury verdict on the basis of plaintiff's guesswork as to the manner in which the jurors arrived at that verdict'" (quoting *Howard D. Jury, Inc. v. R & G Sloane Mfg. Co.*, 666 F.2d 1348, 1352 (10th Cir. 1981)). The court can only assess whether the Kansas courts' decisions were contrary to or an unreasonably applied clearly established federal law. The court concludes the Kansas courts' decisions on the jury instruction issue and ineffective assistance of appellate counsel were reasonable applications of clearly established federal law.

### 5.   Conclusion

The court ends its discussion of Mr. Francis's ineffective assistance claims where it began.  When "a habeas petitioner alleges ineffective assistance of counsel, deference exists both in the underlying constitutional test (*Strickland*) and the AEDPA's standard for habeas relief, creating a 'doubly deferential judicial review.'"  *Harris*, 941 F.3d at 973–74 (quoting *Knowles*, 556 U.S. at 123).  "Under this double deference," the court considers "'whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard.'"  *Id.* at 974 (quoting *Harrington*, 562 U.S. at 105 (other citation omitted)).  There is.  And so, the court denies Mr. Francis's tenth ground for federal habeas relief.

### E.   Ground 11:  Ineffective Assistance of Post-Conviction Counsel

In his eleventh ground for relief, Mr. Francis contends that he "was denied his due process right to the effective assistance of habeas counsel on his first [Kan. Stat. Ann.] 60-1507 petition."  Doc. 2 at 28.  But "there is no constitutional right to counsel in state postconviction proceedings."  *Shinn v. Ramirez*, 142 S. Ct. 1718, 1737 (2022).  And so, the "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."  28 U.S.C. § 2254(i).

Pivoting away from the argument raised in his Amended Petition, Mr. Francis's Traverse argues that the ineffective assistance of post-conviction counsel "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  Doc. 12 at 74 (quoting *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)).  But Mr. Francis didn't default his claims for ineffective assistance of trial counsel.  He lost them on the merits.  Mr. Francis's Traverse confirms as much.  In it, Mr. Francis argues that his post-conviction counsel's deficient performance "was fatal to establishing the prejudice prong of [the] ineffective assistance claim against Thomas."

Doc. 12 at 75. That's an argument about post-conviction counsel's performance leading to an unsatisfying result; not about cause to excuse a procedural default. So, *Martinez* doesn't apply. The court denies this ground for relief.

F.     **Ground 13: *Alleyne* Retroactivity**

In his final ground for federal habeas relief, Mr. Francis argues that his "Hard 40" sentence is unconstitutional under the Supreme Court's holding in *Alleyne v. United States*, 570 U.S. 99 (2013). *Alleyne* held that "any fact that increases [a sentence's] mandatory minimum is an 'element' that must be submitted to the jury." *Id.* at 103. Mr. Francis argues that his "Hard 40" sentence resulted from a finding by a judge, not a jury, that found the necessary aggravating circumstance. So, he contends *Alleyne* applies and invalidates his sentence.

Mr. Francis presented this argument to the Kansas Court of Appeals on his second § 60-1507 motion. But in Kansas, *Alleyne* doesn't apply retroactively "to cases that were final when *Alleyne* was decided." *Kirtdoll v. State*, 393 P.3d 1053, 1057 (Kan. 2017). Because Mr. "Francis was convicted, sentenced, and his case was affirmed on direct appeal before the *Alleyne* decision was rendered in 2013," the Kansas Court of Appeals couldn't retroactively apply *Alleyne*'s holding to his sentence. *Francis V*, 2020 WL 1329220, at *17.

Mr. Francis argues that this retroactivity holding was incorrect. It wasn't. While the Supreme Court hasn't answered the question yet, our Circuit has noted that "[n]o court has treated *Alleyne* as retroactive to cases on collateral review." *United States v. Hoon*, 762 F.3d 1172, 1173 (10th Cir. 2014) (collecting cases from the federal Circuit Courts of Appeals); *see also Lee v. Schnurr*, 858 F. App'x 278, 280 (10th Cir. 2021) ("*Alleyne*'s status as non-retroactive on collateral review is a settled rule, and one observed by all 11 circuit courts to have considered

it, including this one[.]" (quotation cleaned up)), *cert. denied sub nom. Lee v. Meyer*, 142 S. Ct. 779 (2022).  The court thus denies Mr. Francis's thirteenth ground for federal habeas relief.

### G.       Grounds One, Two, Five, Seven, and Nine:  A Procedural Bar

Five of Mr. Francis's grounds for federal habeas relief run head-first into a procedural bar that ultimately prevents the court from considering their merits.  Those five claims contend:

- **Ground One:**  the trial court violated Mr. Francis's Fifth, Sixth, and Fourteenth Amendment rights when it "refused to answer a critical question regarding the aiding and abetting jury instruction[,]"  Doc. 2 at 7;

- **Ground Two:**  the trial court violated Mr. Francis's Fifth, Sixth, and Fourteenth Amendment rights when it "refused to instruct the jury on [his] theory of defense, i.e. that 'mere association with a principal who actually committed the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as aider or abettor[,]'" *id.* at 9;

- **Ground Five:**  the trial court violated Mr. Francis's Fifth, Sixth, and Fourteenth Amendment rights when it "admitted evidence of [his] gun and ammunition ownership[,]" *id.* at 18;

- **Ground Seven:**  the trial court violated Mr. Francis's Fifth, Sixth, and Fourteenth Amendment rights when it "allowed the lead detective to sit near the prosecution table for the entire trial before testifying[,]" *id.* at 21;

- **Ground Nine:**  the trial court and Kansas Supreme Court violated Mr. Francis's Fifth, Sixth, and Fourteenth Amendment rights because the "cumulative errors" of both courts "combined to deny [him] a fair trial and appeal[,]" *id.* at 24.

In his Amended Petition, Mr. Francis presents these claims under the federal due process guarantee of the Fifth and Fourteenth Amendments and the general right to a fair trial guaranteed by the Sixth Amendment.  *See Strickland*, 466 U.S. at 684–85 ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment[.]").  But when he made these claims to the Kansas Supreme Court on direct appeal, he presented them as state claims and cited only state law.  *See* Brief of Appellant at 51–76, 86–92, *State v. Francis*, 145 P.3d 48 (Kan. 2006),

2005 WL 2395690.  And the Kansas Supreme Court addressed them only as state claims.  *See Francis I*, 145 P.3d at 63–67, 68–70, 72.  That's a problem for Mr. Francis in this federal habeas proceeding, but it's not a straightforward one.  So, the court divides its discussion of this issue into three sub-parts reaching the following three conclusions:  (1) Mr. Francis's claims are cognizable in federal habeas because they implicate due process; but (2) Mr. Francis didn't present these claims as federal due process violations to the Kansas Supreme Court, and so he has procedurally defaulted the claims; and (3) his gateway claim of actual innocence doesn't overcome his procedural default.  The court addresses each sub-part below.

### 1.  Mr. Francis Raises Cognizable Federal Habeas Claims

In the State's view, the claims listed above "raise no federal question," and so the court cannot consider the claims on federal habeas review.  Doc. 7 at 13.  But that's not entirely true.  To be sure, had Mr. Francis's federal habeas petition presented state law claims only, the court would agree with the State.  That's because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  But the Amended Petition presents federal claims.  And so, contrary to the State's argument, some of those claims—the ones implicating due process considerations—are cognizable in federal habeas.  *See Leatherwood v. Allbaugh*, 861 F.3d 1034, 1043 (10th Cir. 2017) (explaining that "[f]ederal habeas relief is not available to correct state law errors[,]" but, a § 2254 petitioner "may seek relief . . . if a state law decision is so fundamentally unfair that it implicates federal due process" (citing *Estelle*, 502 U.S. at 67–68)).  As our Circuit has explained, "the applicant must 'draw enough of a connection' between the right to due process and the sentencing court's alleged errors 'to render his claim cognizable on habeas review[.]'"

*Id.* (brackets omitted) (quoting *Perruquet v. Briley*, 390 F.3d 505, 512 (7th Cir. 2004)).  Mr. Francis has done so here.

To be clear, "habeas applicant[s] cannot transform a state law claim into a federal one merely by attaching a due process label." *Id.*  If they could, "'every erroneous decision by a state court on state law would come to federal court as a federal constitutional question.'" *Id.* (quoting *Gryger v. Burke*, 334 U.S. 728, 731 (1948)) (brackets omitted).  But, our Circuit explicitly has named "erroneous jury instructions and improper admission or exclusion of evidence" as "[e]xamples of state law decisions that may violate due process" such that they become cognizable federal habeas claims. *Id.* at 1043 & n.7, n.8 (collecting cases).  Mr. Francis raises claims of that nature here.  Grounds One and Two involve jury instructions.  Ground Five involves the admission of evidence.  And Ground Nine alleges cumulative error on all of the trial court's evidentiary and instructional rulings.  The court questions whether Ground Seven—about a detective sitting near the prosecution table before testifying—is serious enough to implicate due process concerns.  But the court need not resolve that question because of the larger hurdle Mr. Francis must overcome.  The court turns to that hurdle, below.

## 2.  Mr. Francis Has Procedurally Defaulted These Claims

That Mr. Francis's claims are *cognizable* doesn't necessarily mean the court can consider them.  "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also* 28 U.S.C. § 2254(b)(1).  To exhaust his state court remedies, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.  If a petitioner hasn't exhausted his state court remedies, and the state court wouldn't allow him to exhaust now because of its own procedural rules, then petitioner has procedurally defaulted the claim—unless

the petitioner meets certain stringent exceptions, discussed below.  *Coleman*, 501 U.S. at 750.

"The exhaustion requirement . . . is grounded in principles of comity and reflects a desire to

protect the state courts' role in the enforcement of federal law[.]"  *Castille v. Peoples*, 489 U.S.

346, 349 (1989) (quotation cleaned up).

For a federal court to consider a federal constitutional claim in a habeas application, the

petitioner must have presented the claim fairly to the state court so that the state court had an

"'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"

*Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (quoting *Picard v. Connor*, 404

U.S. 270, 275 (1971)).  "A petitioner need not invoke talismanic language or cite book and verse

on the federal constitution."  *Id.* (quotation cleaned up).  Instead, the "crucial inquiry is whether

the 'substance' of the petitioner's claim has been presented to the state courts in a manner

sufficient to put the courts on notice of the federal constitutional claim."  *Id.* (quoting *Connor*,

404 U.S. at 278).

Mr. Francis didn't comply with this requirement because he didn't present these claims to

the Kansas Supreme Court as federal due process violations.  Indeed, the words "due process"

never appear in his opening appellate brief to the Kansas Supreme Court.  Also, he didn't cite a

single federal case in the brief's sections discussing these claims.  To the contrary, the sections

raising these claims exclusively cited Kansas standards and Kansas law.  And, when the Kansas

Supreme Court addressed Mr. Francis's claims about the trial court's jury instructions,

evidentiary rulings, and decision not to sequester the lead detective witness during trial, it

mentioned nothing about a federal constitutional claim.  These circumstances can lead to just one

conclusion:  Mr. Francis didn't present the substance of his claims about the trial court's

evidentiary and instructional rulings in a manner sufficient to put the Kansas Supreme Court on notice of alleged federal due process violations.

Resisting this conclusion, Mr. Francis highlights a few words from his brief on direct appeal: (1) the cumulative error section, asserting that the trial court's cumulative errors "denied him the right to a fair trial[,]" and (2) his conclusion, asserting that the "errors committed by the trial court denied [him] the fundamental right to a fair trial guaranteed by the Sixth Amendment to the United States Constitution and Section 10 of the Bill of Rights contained in the Kansas Constitution." Brief of Appellant at 86, 93, *State v. Francis*, 145 P.3d 48 (Kan. 2006), 2005 WL 2395690. But those fleeting references don't explain how the trial court's errors were "so fundamentally unfair" that they "implicate[ ] federal due process." *Leatherwood*, 861 F.3d at 1043. As a result, the court concludes that Mr. Francis didn't fairly present Grounds One, Two, Five, Seven, and Nine to the Kansas Supreme Court. And, as Mr. Francis concedes, the Kansas state courts would bar him from raising these claims now, so many years after the Kansas Supreme Court's decision. *See* Doc. 12 at 17. Mr. Francis thus has procedurally defaulted Grounds One, Two, Five, Seven, and Nine. *See Perruquet*, 390 F.3d at 512, 520–22 (concluding, under similar circumstances, that § 2254 petitioner had asserted cognizable due process challenges to state court's evidentiary and instructional rulings, but ultimately holding that he had "not fairly present[ed] his due process claim to the [state] courts and thereby procedurally defaulted that claim").

### 3.   Mr. Francis Doesn't Satisfy the Actual Innocence Exception (Ground 12)[8]

Despite the procedural bar, Mr. Francis isn't out of options.  To "facilitate federal habeas review[,]" Mr. Francis must pass through one of "two procedural gateways—cause and prejudice or the fundamental miscarriage of justice exception (commonly known as a showing of actual innocence)[.]"  *Fontenot v. Crow*, 4 F.4th 982, 1028 (10th Cir. 2021).  Mr. Francis invokes only the actual innocence exception, so the court focuses its analysis on that exception.

A "credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."  *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).  "This rule, or fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *Id.* (quotation cleaned up).  "When used to overcome procedural issues, 'a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Fontenot*, 4 F.4th at 1030 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

To assert "innocence as a gateway to defaulted claims[,]" a petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House v. Bell*, 547 U.S. 518, 536–37

---

[8]    Mr. Francis raises his actual innocence claim in Ground 12 of the Amended Petition.  *See* Doc. 2 at 29–31.  The court analyzes his arguments there to determine whether actual innocence can serve as a gateway around the procedural bar preventing the court from considering Grounds One, Two, Five, Seven, and Nine.  *See Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").  But, to the extent Mr. Francis raises a freestanding actual innocence claim as an independent basis for habeas relief, the court denies that claim.  The Supreme Court has "never" recognized "freestanding claims of actual innocence."  *Id.* at 404–05.

(2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  To meet this stringent standard, petitioner must provide "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.  In our Circuit, evidence is "new" for these purposes "so long as it was not presented at trial."  *Fontenot*, 4 F.4th at 1032 (quotation cleaned up).  In other words, the petitioner need not show the evidence was previously unavailable after exercising due diligence. *Id.*

In the end, the Supreme Court has stressed that "tenable actual-innocence gateway pleas are rare[.]"  *McQuiggin*, 569 U.S. at 386.  "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'"  *Id.* at 401 (quoting *Schlup*, 513 U.S. at 316).

Mr. Francis's actual innocence arguments fall into three general categories:

1) challenging the credibility of Ms. Sharon Hollingsworth, the victim's mother and a key eyewitness to his murder;[9]

2) allegations from Mr. Corey Shannon that Mr. Francis didn't kill Clem Hollingsorth;[10] and

---

[9]      Mr. Francis supports this argument with a 2015 affidavit from Mr. Corey Shannon—the person who Mr. Francis's trial counsel previously represented and who invoked the Fifth Amendment against testifying at Mr. Francis's preliminary hearing and trial.  The Affidavit reports that Mr. Shannon "knew [Mr. Francis] had nothing to do with killing Clem Hollingsworth" and that "Sharon Hollingsworth told [him] in an effort to compel [his] support, that she didn't really see who fired the shots that killed Clem Hollingsworth."  Doc. 12-1 at 1.

He also cites a 2021 Affidavit from Mr. Zach Beyer, a personal investigator hired by Mr. Francis's current counsel.  *See* Doc. 12-4.  Mr. Beyer testifies that he met with Mr. Reggie Gant, who Mr. Francis's trial counsel originally tried "to paint . . . as one of several possible suspects" for Mr. Hollingsworth's murder.  *Francis III*, 2012 WL 4794595, at *8.  According to Mr. Beyer, Mr. Gant is "willing to testify" that Ms. Hollingsworth called him a month after the murder and tried "to convince [him] to confess to [the] murder[.]"  Doc. 12-4 at 1.

[10]      Mr. Francis supports this argument with Mr. Shannon's 2015 affidavit, *see supra* n.9, as well as a 2021 Affidavit from Mr. Beyer, who reportedly met with Mr. Shannon in 2021, *see* Doc. 12-2. According to Mr. Beyer, Mr. Shannon is "willing to testify" that (1) he told Mr. Francis's trial counsel

3) evidence about Mr. Gillihan's PTSD, which supports Mr. Francis's *Brady* claim, discussed above.[11]

These arguments essentially re-litigate issues from Mr. Francis's trial. They can't meet the high bar for an actual innocence claim. The court addresses each argument, below.

*First*, Mr. Francis and the Kansas courts have litigated Ms. Hollingsworth's eyewitness testimony ad nauseum. The Kansas courts have acknowledged repeatedly that Ms. Hollingsworth's credibility was a central issue at trial. *See Francis I*, 145 P.3d at 64 ("The critical issue for the jury would have been the credibility of Sharon Hollingsworth, who identified Francis as being at the murder scene"); *Francis III*, 2012 WL 4794595, at *8 (recognizing "inconsistencies in [Ms. Hollingsworth's] statements regarding the level of certainty of her identification of Francis as the passenger in the suspect vehicle and whether she actually witnessed firearms being used outside the suspect's car window"); *Francis IV*, 2014 WL 5312932, at *3 ("Hollingsworth's mother testified that she was familiar with Francis and that she clearly saw him riding as a passenger in the car from which the shots were fired, although she could not say definitively who fired which shots."); *Francis V*, 2020 WL 1329220, at *14 ("[E]vidence of Sharon [Hollingsworth's] uncertain identification was thoroughly developed by [Mr. Francis's counsel] at trial."). And, indeed, the "record shows [Mr. Francis's trial counsel] sufficiently impeached the credibility of Sharon Hollingsworth's eyewitness testimony[.]" *Francis III*, 2012 WL 4794595, at *8; *see also Francis V*, 2020 WL 1329220, at *15 ("[Ms.

---

that Mr. "Francis had nothing to do with Clem Hollingsworth's murder[;]" and (2) Mr. Francis never told him in a phone call that he would kill Mr. Hollingsworth or someone close to him—contrary to evidence presented at trial. *Id.* at 1–2; *see also Francis I*, 145 P.3d at 56.

[11]    Mr. Francis supports this argument with the evidence that triggered his motion for a new trial based on a *Brady* claim. *See* Doc. 12-3. He also highlights testimony from that motion hearing before the Johnson County District Court, where the court ultimately denied Mr. Francis's motion. *See* Doc. 12-9 (Amended Transcript of Motion Hearing).

Hollingsworth]'s inconsistent eyewitness identifications were known prior to trial and presented at trial to impeach her eyewitness testimony."). But, as the Kansas Court of Appeals recognized, "[w]itness credibility is an issue for the jury to decide, and they found Sharon Hollingsworth's testimony to be credible despite this impeachment." *Francis V*, 2020 WL 1329220, at *14 (internal quotations omitted). So, the new evidence that Mr. Francis presents challenging Ms. Hollingsworth's credibility doesn't shake the court's confidence in the trial's outcome. This issue was litigated thoroughly at trial. And Mr. Francis does nothing to convince the court that, in light of the new evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

*Second*, Mr. Shannon's testimony that Mr. Francis didn't kill Mr. Hollingsworth quite simply doesn't change the game. The Supreme Court has provided examples of the kind of evidence that could meet the demanding actual innocence standard: "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[.]" *Schlup*, 513 U.S. at 324. While that list isn't exhaustive, the court concludes that Mr. Shannon's testimony doesn't come close to the kind of "evidence of innocence [that is] so strong that a court cannot have confidence in the outcome of the trial[.]" *Schlup*, 513 U.S. at 316. Mr. Shannon didn't witness the murder. Indeed, during this case's relevant period, Mr. Shannon "was incarcerated in Missouri." *Francis I*, 145 P.3d at 56. And, he doesn't provide any evidence to corroborate his testimony that Mr. Francis didn't kill Mr. Hollingsworth.

*Third*, this Order already has considered the evidence about Mr. Gillihan's PTSD and the resulting impeachment power that this evidence could've imposed at trial when it analyzed Mr. Francis's *Brady* claim, above. While § 2254's exceedingly deferential standard governed this analysis, the court nevertheless concludes that the evidence about Mr. Gillihan's PTSD wouldn't

have changed the entire trial so dramatically that no reasonable juror could've found Mr. Francis guilty beyond a reasonable doubt.

As the Supreme Court has stressed, "tenable actual-innocence gateway pleas are rare[.]" *McQuiggin*, 569 U.S. at 386. The court concludes that Mr. Francis's new evidence doesn't meet the demanding actual innocence standard. And so, his case isn't one of those "rare" cases where the gateway to procedurally barred claims should open. Grounds One, Two, Five, Seven, and Nine, thus remain procedurally barred, and the court can't consider their merits.

## IV.    Conclusion

In sum, Mr. Francis isn't entitled to federal habeas relief on any of his 13 asserted claims. Mr. Francis withdrew Ground Four. Doc. 12 at 33. And the court denies Grounds Three, Six, Eight, Ten, Eleven, Twelve, and Thirteen. It also dismisses Grounds One, Two, Five, Seven, and Nine because it lacks jurisdiction to consider those claims.

## V.    Certificate of Appealability

Finally, when the court "enters a final order adverse" to a § 2254 petitioner, it must "issue or deny a certificate of appealability[.]" Rules Governing Section 2254 Cases, Rule 11(a). Without such a certificate, a petitioner may not appeal the denial of his habeas petition. But, "[i]f the court denies a certificate, the [petitioner] may . . . seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." *Id.*

A court may grant a certificate of appealability only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner can satisfy this standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" or that the issues presented in the petition are "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529

U.S. 473, 484 (2000) (quotation cleaned up).  And, when the court bases its ruling on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.* at 478.

Here, the court should not issue a certificate of appealability.  Nothing suggests that the court's rulings on any issue are wrong, or even debatable, and no record authority suggests that the Tenth Circuit would resolve this case differently.  The court thus declines to issue a certificate of appealability for any of Mr. Francis's claims.  Mr. Francis may not appeal the court's denial of a certificate, but he may seek a certificate of appealability from the Tenth Circuit.

**IT IS THEREFORE ORDERED BY THE COURT THAT** petitioner John F. Francis's Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 2) is denied in part and dismissed in part, and no certificate of appealability shall issue.

**IT IS SO ORDERED.**

**Dated this 29th day of July, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**
